**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CALL ONE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 124** |
| | ) | |
| **LORI BETH ANZINE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Call One, Inc. has sued Lori Beth Anzine, a former employee, for alleged
misappropriation of trade secrets in violation of the Defend Trade Secrets Act (DTSA),
18 U.S.C. § 1836 (count 1), and the Illinois Trade Secrets Act, 765 ILCS 1065/2 (count
2).[1] Anzine filed a counterclaim seeking a declaratory judgment that the non-solicitation
covenant she signed during her tenure at Call One is unenforceable. Anzine has
moved for summary judgment on count 1 of the amended complaint and on her
counterclaim. She also has requested that the Court award attorney's fees and costs
on the ground that Call One's DTSA misappropriation claim was made in bad faith. For
the reasons stated below, the Court grants summary judgment in favor of Anzine on
count 1 (the DTSA claim) but denies Anzine's request for attorney's fees and costs, and
grants in part Anzine's motion for summary judgment on the counterclaim, finding the

---

[1] It is unclear to the Court why Anzine did not move for summary judgment on count 2 of
Call One's amended complaint.

non-solicitation covenant unenforceable as written but modifying it to eliminate the problem.

## Background

The following material facts are taken from the parties' statements of undisputed facts and the exhibits attached to or referenced by those statements.[2]

### A.     The non-solicitation covenant

Call One is a telecommunications service provider that has its principal place of business in Illinois.  Anzine was employed by Call One as a sales representative from 2003 until the beginning of January 2018.  In 2012, Call One required Anzine to sign a "Non-Competition Agreement" (the Agreement) as a condition of her continued employment.  Pursuant to this agreement, for the duration of her employment with Call One, Anzine was prohibited from selling telecommunications services or products other than in her role as a Call One sales representative.  *See* Compl. Ex. B ¶ 1.a.  The Agreement also included the following post-separation non-solicitation covenant:

> [D]uring the 12 month period after the date upon which the Employee ceases to be employed by Call One (the "Termination Date"), Employee shall not . . . solicit any entity for the purpose of selling any

---

[2] The only facts included in this opinion are those that are adequately supported by the admissible evidence of record.  The Court does not consider the portions of Call One Executive Chairman H. Edward Wynn's declaration that summarize and draw conclusions from "various documents" produced in a pending state court case against Blase Viti, another former employee, and Access One, a competitor of Call One, because those portions of the record are inadmissible hearsay, in addition to being of questionable relevance to the present suit against Anzine.  *See* Pl.'s Resp. to Def.'s Statement of Material Facts Relating to the Mot. for Summ. J. on Count 1 (Pl.'s Resp. to SUMF on Count 1), Ex. 6 (Wynn Decl.) ¶¶ 6-11.  The Court also declines to consider Anzine's "reply" to Call One's response to her statement of undisputed material facts, because such a reply is not contemplated by Local Rule 56.1(a).  *See* N.D. Ill. L.R. 56.1(a).

Telecommunication Services or Products, or sell any Telecommunications or Products to any entity which (i) is at the time of solicitation, or which was, at any time from the beginning of Employee's employment by Call One to the date of the solicitation, a customer of Call One, or (ii) was a Prospective Customer of Call One as of the Termination Date.

*Id.* ¶ 1.b.  The Agreement defines a "Prospective Customer" as "a business which Call One has solicited or has made plans to solicit as of the Termination Date."  *Id.* ¶ 1.c.  The term "Telecommunications Services or Products" is defined in the Agreement as "all services and products which Call One sells at any time during Employee's employment, or which Call One has made plans to sell as of the Termination Date."  *Id.* ¶ 1.d.  The Agreement also includes a severability clause, which contemplates that any provision of the agreement that is found by a court to be unenforceable "may be reformed by a court without further action by the parties to the extent necessary to make such provision valid and enforceable."  *Id.* ¶ 2.

**B.     Call One's information and technology security policies**

As a condition of employment, Call One employees agree to comply with policies designed to protect the company's confidential information.  Call One runs annual security training sessions and each year requires its employees to acknowledge their agreement to comply with the expectations and controls set forth in Call One's information security policies.  The company's information security policies are set forth in a Policy & Procedures Manual that consists of twenty-five numbered Information Security Policies (ISPs), totaling over 100 pages.  *See* Pl.'s Resp. to SUMF on Count 1, Ex. 1 (Surdenik Decl.), Ex. A (Policy Manual).  ISP 3, entitled "Confidential Data Policy & Procedures," states that employee users of confidential data may access confidential data only to perform their job functions.  Policy Manual at 20.  Further, employees "must

protect any confidential information to which they have been granted access and not reveal, release, share, email unencrypted, exhibit, display, distribute or disclose the information unless necessary to do [their] job or the action is approved by [a] supervisor." *Id.* Under ISP 24, entitled "Email Security Policy & Procedures," all e-mail "messages containing sensitive information must include the appropriate classification (Confidential) in the header" to "remind recipients that the information must not be disseminated further, or be used for unintended purposes, without the proper authorization." *Id.* at 121. Employees also are instructed not to use "personal electronic mail accounts . . . for any Call One business messages" because doing so "would circumvent logging, virus checking, content screening, and automated backup controls that Call One has established." *Id.* at 120.

Confidential data is defined in several places within the Policy & Procedures Manual. In ISP 4, entitled "Data Classification Policy & Procedures," confidential information is defined as "any information deemed proprietary and sensitive," to include the following:

1. Customer Voicemails[;]
2. Customer Call Recordings (wherever applicable)[;]
3. Customer IP addresses & MAC addresses[;]
4. All unique User IDs and passwords that access the Call One infrastructures;
5. All Privileged User IDs and passwords that access the Call [One] infrastructures;
6. Employee or customer personal information including addresses, social-security numbers, dates of birth, etc[.];
7. All customer infrastructure and access schematics;
8. All Call One infrastructure and access schematics;
9. Customer payment information;
10. Customer tax ID;
11. Company financial data; and payroll information[.]

*Id.* at 26. ISP 23, entitled "Acceptable-Use Policy," states that "Confidential Information

may include . . . customer lists and information," and it refers employees to ISP 3 for details. *Id.* at 116. ISP 3, in turn, provides the same non-exhaustive list of examples of confidential data found in ISP 4. *See id.* at 22.

ISP 3 also states that "[u]sers must be advised of any confidential data [to which] they have been granted access. Such data must be marked or otherwise designated 'confidential.'" *Id.* at 20. Specifically, "[c]onfidential data must be labeled either at the top or bottom of each page or through use of a watermark embedded into the background of each page." *Id.* Trade secrets likewise "must be identified as such prior to being disclosed" to any employees. *Id.* at 115.

Call One's Employee Handbook also touches on information security issues. The handbook prohibits employees from acquiring, using, accessing, copying, removing, altering, or disclosing to any third parties "any confidential business information for any purpose other than to perform duties required in the fulfillment of job responsibilities or in accordance with expressly stated company[-]sponsored activities." Surdenik Decl., Ex. B (Employee Handbook) at 28. This prohibition includes (1) "Unauthorized disclosure of business secrets or other similar confidential information"; (2) "Misuse or unauthorized disclosure of confidential business information not otherwise available to persons or firms outside Call One"; (3) "Unauthorized disclosure of confidential financial data, or other nonpublic proprietary company information"; and (4) "Sharing confidential information regarding business partners, vendors or customers." Employee Handbook at 28.

In addition to requiring its employees to abide by the ISPs and the Employee Handbook, Call One also requires them to comply with guidelines designed to ensure

that Customer Proprietary Network Information (CPNI) is handled in accordance with federal regulations. Lastly, Call One employees accessing the company network remotely via a VPN connection are reminded when they log in that "[t]his is a private computer system containing confidential information" and that the system "must be used for authorized business purposes only." Surdenik Decl., Ex. C.

## C.    The Customer Report

On September 9, 2016, Robert Kintz, who was Call One's sales director at the time, sent all Call One sales representatives, including Anzine, an e-mail with the subject line "FW: List of Account with assigned rep." Def.'s Mot. for Summ. J. on Count 1, Ex. 2 (Anzine Suppl. Decl.), Ex. A, at 4. Attached to the e-mail was an Excel spreadsheet entitled "Copy of Customer Report 8-26-16.xlsx." *Id.* According to Kintz's sworn declaration, he sent this e-mail to the sales representatives at the direction of Call One's executive vice president of sales, in response to complaints from the sales force that commissions were being paid to the wrong representatives or not being paid at all. *See* Def.'s Mot. for Summ. J. on Count 1, Ex. 3 (Kintz Decl.) ¶ 5. Kintz included the following message in the body of the e-mail:

> All,
>
> In order to get an accurate database, please take a look at this list of all accounts and note any changes in the "Rep Changes" highlighted column on the far right and send this back to me. I am looking to find out who is the current rep on the account.
>
> Since this is critical to move forward, I need you to review this and return to me BY MONDAY THE 19TH.
>
> Contact me if you have any questions.

Anzine Suppl. Decl., Ex. A, at 4.

The Customer Report spreadsheet attached to the e-mail contained nine columns of information: Subscriber ID, DCA Date Installed, DCA Status Date, MBS Activation Date, Subscriber Name, Total MRC (monthly recurring charges), Agent Num, Agent Name, and Rep Changes. *See* Def.'s Mot. for Summ. J. on Count 1, Ex. 4. The spreadsheet appears to be sorted by total monthly recurring charges, from highest to lowest. The information contained in the Customer Report was culled from Call One's master billing system database, which is a comprehensive, password-protected database of customer information to which very few Call One employees and executives have access.[3] Kintz was not instructed by his superiors to have the sales representatives delete the Customer Report after reviewing it, making necessary changes, and sending it back to him. Kintz's e-mail to the sales representatives did not indicate that the Customer Report was a trade secret or otherwise contained confidential or sensitive information, nor was the spreadsheet marked as confidential. *See* Anzine Suppl. Decl. Ex. A, at 4; Def.'s Mot. for Summ. J. on Count 1, Ex. 4. Kintz testified during his deposition, however, that he understood information about monthly recurring charges to be confidential.[4] *See* Pl.'s Mot. for Leave to File Additional Statements of Fact, Ex. A, Ex. 7 (Kintz. Dep.), 21:15-22:1. Brian Barkley, the CEO of

---

[3] The contents of the master billing system database, the effort Call One has expended to obtain the information contained in the database, and the specific measures Call One takes to maintain the confidentiality of that database are not material facts because Call One does not allege that Anzine misappropriated information from the master billing system database itself. Rather, Call One alleges that Anzine misappropriated the Customer Report.

[4] On June 6, 2018, Call One filed a last-minute motion for leave to file additional statements of fact adduced after Call One responded to Anzine's motions for summary judgment, but before the close of fact discovery. The Court has considered these statements of fact and the attached exhibits.

Access One, also testified during his deposition that he considered monthly recurring charges to be confidential information.  *Id.*, Ex. A, Ex. 8 (Barkley Dep.), 57:2-57:16.

On September 14, 2016, as requested, Anzine e-mailed Kintz a modified version of the Customer Report spreadsheet, which she named "Copy of Copy of Customer Report 8-26-16.xlsx."  Anzine Suppl. Decl. Ex. A, at 1.  Over six months later, on March 23, 2017, Anzine sent a "Copy of Copy of Customer Report 8-26-16.xlsx" to her personal AOL e-mail address from her Call One e-mail address.  On March 27, 2017, Anzine sent a copy of the Customer Report as an e-mail attachment to her then-fiancé Thomas McKeon.[5]  McKeon is not involved in the telecommunications industry.  McKeon Decl. ¶ 11.  He stated in a declaration submitted to the Court that, while he was living with Anzine, "she would periodically send me documents via email so that I could print them on [the] printer located in the same basement as her home office."  *Id.* ¶ 5.  Anzine did not mention these March 2017 transmissions of the Customer Report in her answer to an interrogatory served by Call One, nor has she explained why she sent them.

In mid-2017, Call One made a number of "strategic changes" to its sales team.  Wynn Decl. ¶ 3.  As a result of those changes, in October 2017 Anzine approached Chris Surdenik, Call One's CEO, regarding the possibility of becoming an independent distributor for Call One.  On November 30, 2017, Call One provided Anzine with a first

---

[5] Call One CEO Surdenik's unsupported assertion that "Call One recently learned that Anzine sent several other unencrypted messages" containing confidential information to McKeon in 2017, Surdenik Decl. ¶ 12, is inadmissible hearsay that may not be considered on a motion for summary judgment.  *See, e.g.*, *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009).

draft of a proposed distributorship agreement, and on December 12, 2017, Anzine retained an attorney, Lawrence Karlin, to represent her in the distributorship negotiations. The proposed distributorship agreement provided for payment to Anzine of a sales override based on the monthly recurring commissionable revenue for an enumerated list of customers, identified by Call One in an exhibit to the proposed agreement. On December 14, 2017, Anzine e-mailed the "Copy of Copy of Customer Report 8-26-16.xlsx" to her personal Gmail account. Anzine stated in a declaration that she did this to compare the list of customers attached to the proposed distributorship agreement with the customers assigned to her in the Customer Report, because a "significant issue" in the distributorship negotiations was identifying the customers for which she was to receive the proposed sales override. Anzine Decl. ¶ 18.

The negotiations ended unsuccessfully on December 31, 2017. On January 3, 2018, Karlin sent an e-mail to Bruce Menkes, Call One's counsel, to request that an employee from Call One's human resources department contact Anzine regarding COBRA coverage, because it appeared that further negotiations would be futile. Kristin Syoen, Call One's Director of Human Resources, sent Anzine a letter stating that Call One would treat the January 3, 2018 request for COBRA coverage as a voluntary resignation from the company. A non-forensic examination by Wynn and Syoen of the work laptop issued to Anzine subsequently revealed that she attempted to delete a number of documents from her desktop on December 15, 2017 and December 20, 2017, including a document named "Copy of Copy of Customer Report 8-26-16 -- Copy," one named "Lori Anzine customers 2017," and another entitled "PrimeManagerDistributionList(5-21-07)." Wynn Decl. ¶¶ 22-23. According to Wynn,

documents pertaining to two of Anzine's "more significant customers" were altered or "moved from the computer." *Id.* ¶ 24. Lastly, the examination "also revealed that on January 1, 2018, at 5:08 p.m., a removable disk was used on the computer, and . . . additional files were deleted from the computer at that time." *Id.* ¶ 25. [6]

On January 8, 2018, Call One filed the present lawsuit and moved for a temporary restraining order and preliminary injunction against Anzine. That same day, Anzine e-mailed the Customer Report to Karlin, who is representing Anzine in the lawsuit. In February 2018, Anzine filed her counterclaim regarding the non-solicitation covenant. The Court denied Call One's motion to dismiss the counterclaim for lack of jurisdiction in March 2018. *See* dkt. no. 54. As indicated earlier, Anzine has moved for summary judgment on her counterclaim and on count 1 of the amended complaint (the DTSA claim).

**Discussion**

Summary judgment is warranted if the moving party shows that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, courts must construe all facts in the light most favorable to the non-moving party and draw reasonable inferences in that party's favor. *Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 786 (7th Cir. 2007). Nonetheless, to survive summary

---

[6] The admissibility of these statements by Wynn is at best questionable, because he provided no foundational explanation for what the "non-forensic" examination involved or how he determined that Anzine had performed the actions Wynn claims she took.

judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The non-moving party may not merely rely on the allegations in its pleadings to create such a dispute; it must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

## A.  Anzine's counterclaim[7]

Anzine contends that the post-separation non-solicitation covenant contained in her Non-Competition Agreement is unenforceable. Specifically, Anzine argues that the covenant is unreasonably overbroad because, in addition to prohibiting solicitation of current Call One customers with which Anzine had direct contact, it also prohibits solicitation of past and prospective Call One customers, as well as current customers with which Anzine had no interaction. Call One contends that the non-solicitation covenant is enforceable as written because it is narrowly tailored to protect Call One's legitimate business interests in maintaining its near-permanent customer relationships and guarding confidential trade secrets, to include the information contained in the Customer Report. Call One further contends that summary judgment is not warranted because Anzine has failed to adduce any evidence that the prohibitions on solicitation of past and prospective customers, as well as all current customers, are so broad as to impose an undue hardship on Anzine by effectively precluding her from working in the telecommunications industry.

Because they are restraints on trade, restrictive covenants are scrutinized

---

[7] In its response to Anzine's motion, Call One has not argued that the parties' dispute is insufficiently concrete to warrant entry of a declaratory judgment.

carefully under Illinois law. *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 268, 880 N.E.2d 188, 195 (2007). "In determining the enforceability of a restrictive covenant in an employment setting, the test applied by Illinois courts is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Dam, Snell & Taveirne, Ltd. v. Verchota*, 324 Ill. App. 3d 146, 151, 754 N.E.2d 464, 468 (2001).

The reasonableness of a postemployment restrictive covenant is a question of law. *Id.* A restrictive covenant is reasonable "only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor[;] and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 17, 965 N.E.2d 393, 396. Beyond this general framework, however, reasonableness determinations must be made on a case-by-case basis. Because "[t]here is no inflexible formula" for determining reasonableness, precedents are of "less than usual value." *Id.* ¶ 33, 965 N.E.2d at 400 (citation omitted); *see also Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447, 879 N.E.2d 512, 522 (2007).

Likewise, in determining whether a legitimate business interest exists, courts are to consider the totality of the circumstances. "Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Reliable Fire*, 2011 IL 111871, ¶ 43, 965 N.E.2d at 403. No factor carries more weight than another; the importance of a given factor necessarily depends on case-specific facts and circumstances. *Id.*

In this case, Call One asserts legitimate business interests in maintaining its customer relationships and guarding confidential information. For purposes of this motion, the Court will assume that Call One does have near-permanent relationships with many of its customers and that the Customer Report at issue qualifies as a trade secret or otherwise comprises confidential information. As Call One notes, the non-solicitation covenant has a limited and reasonable duration of one year from the date of termination of employment. For that one-year period, the Agreement precludes Anzine from soliciting, for the purpose of selling telecommunications services or products, any current Call One customers, any entity that has been a customer of Call One at any time since 2003, and any entity that Call One had solicited or made plans to solicit as of January 3, 2018. *See* Compl. Ex. B ¶ 1.b.

Taking into consideration the totality of the facts and circumstances in this case, the Court concludes that the non-solicitation covenant in question is more restrictive than is required for the protection of the legitimate business interests cited by Call One. Specifically, the terms of the non-solicitation covenant go beyond what is reasonably necessary to protect Call One's near-permanent relationships with customers. First, a restriction on solicitation of anyone who was "at any time from the beginning of [Anzine's] employment . . . to the date of the solicitation, a customer of Call One" is not needed to protect ongoing client relationships and / or the relationships that Call One was working on building before Anzine left the company. Compl. Ex. B ¶ 1.b. Anzine began working for Call One in 2003. On its face, this restriction would prevent Anzine from soliciting former Call One customers who ended their relationship with Call One well over ten years ago. It would also prevent Anzine from soliciting former, current,

and prospective Call One customers with which she had no personal contact and about which she has never had any personal knowledge. *See, e.g.*, *Cambridge Engineering*, 378 Ill. App. 3d at 455, 879 N.E.2d at 528 ("[C]ourts are reluctant to enforce provisions that prohibit former employees from servicing customers that they never had contact with while working for their original employer.").

The non-solicitation covenant also is broader than reasonably necessary to protect Call One's confidential information. Anzine's alleged misappropriation of the August 2016 Customer Report does not justify prohibiting her from soliciting any entity that was a Call One customer at some point since 2003 but has since ceased doing business with the company. The ban on soliciting all current customers regardless of whether Anzine had any personal contact with or knowledge of them at Call One is likewise more restrictive than reasonably necessary to protect confidential Call One information acquired by Anzine. Call One itself asserts in the amended complaint that Anzine was responsible for just a "small percentage" of its customers. Am. Compl. ¶ 16. Moreover, it is undisputed that a technician from a forensic IT firm retained by Call One examined Anzine's e-mail accounts, cell phone, and iPad and deleted all copies of the Customer Report, and Call One does not allege that Anzine still possesses a copy of the Customer Report. Call One has produced no evidence that Anzine has used the Customer Report to solicit Call One customers or otherwise disclosed it to a competitor. Lastly, the prohibition on soliciting prospective customers, as defined by the Agreement, also is more restrictive than necessary to protect Call One's confidential information because it is not limited to those prospective customers about which Anzine acquired such information. There is no indication that the Customer Report that Anzine is alleged

to have misappropriated contained information about prospective customers. Yet as written, the non-solicitation extends to potential customers that were "in the pipeline" at the time of Anzine's separation from Call One even if Anzine knew nothing about them.

Because the terms of the non-solicitation covenant cannot be said to be "no greater than is required" for the protection of Call One's legitimate business interests, the Court concludes that the covenant, as written, is unreasonable as a matter of law and thus unenforceable. *Reliable Fire*, 2011 IL 111871, ¶ 17, 965 N.E.2d at 396. Accordingly, Anzine is entitled to a declaratory judgment that the non-solicitation covenant is unenforceable as written regardless of her failure to provide the Court with specific evidence that it imposes an undue hardship on her.

It is sometimes appropriate, however, for a court to "choose to modify an overbroad restrictive covenant rather than invalidate it outright." *Cambridge Engineering*, 378 Ill. App. 3d at 456, 879 N.E.2d at 529. In determining whether it is appropriate to modify rather than invalidate an overbroad restrictive covenant, "the fairness of the restraints contained in the contract is a key consideration." *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 51, 44 N.E.3d 463, 477 (citation omitted). "A restrictive covenant is unfair where its terms 'clearly extend far beyond those necessary to the protection of any legitimate interest' of the employer or, in other words, amount to 'unrealistic boundaries in time and space.'" *Id.* ¶ 51 (quoting *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.,* 308 Ill. App. 3d 337, 347, 719 N.E.2d 1141, 1149 (1999)).

In this case, the Non-Competition Agreement expressly contemplates that any provision of the agreement found unenforceable by a court "may be reformed . . .

without further action by the parties to the extent necessary to make such provision valid and enforceable." Compl. Ex. B ¶ 2. More importantly, although the Court has concluded that the terms of the non-solicitation covenant are more restrictive than reasonably necessary, because there is a one-year limitation on the provision and because it does not appear to entirely prevent Anzine from working in the telecommunications industry, the Court does not believe the original version is so unfair as to preclude judicial modification of its terms. In this case, the covenant may be reformed by limiting it to a prohibition on soliciting for the purpose of selling any Telecommunications Services or Products or selling Telecommunications Services or Products to any entity that (i) was a customer or a Prospective Customer of Call One as of the Termination Date and (ii) was customer or Prospective Customer for which Anzine had responsibility while employed by Call One. *See Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *16 (N.D. Ill. Sept. 8, 2017) ("Illinois decisions support modifying a non-solicitation provision to cover only those customers for which the former employee had responsibility, and . . . the severability provision in [the] Employment Agreement makes that result particularly appropriate here.").

## B. Call One's DTSA claim

Anzine has moved for summary judgment on Call One's DTSA claim (count 1) on two separate grounds. Anzine first argues that Call One cannot establish that the Customer Report she allegedly misappropriated is a trade secret within the meaning of DTSA. She also contends that Call One is unable to establish that she misappropriated the Customer Report, as that term is defined by DTSA. Call One argues that the Customer Report is a trade secret within the meaning of the Act and that Anzine

misappropriated it by sending it to her personal e-mail account as well as to third persons, in violation of her duty to protect the secrecy of Call One's confidential information.

The Defend Trade Secrets Act, which took effect in May 2016, establishes a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1); *see* Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376, 381-82.  The Act defines "misappropriation" as follows:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (iii) before a material change of the position of the person, knew or had reason to know that—
>>
>>> (I) the trade secret was a trade secret; and
>>>
>>> (II) knowledge of the trade secret had been acquired by accident or

mistake[.]

18 U.S.C. § 1839(5). The term "improper means" is defined as including "breach of a duty to maintain secrecy," among other things. *Id.* § 1839(6).

Although Anzine and Call One disagree regarding whether the Customer Report is a trade secret within the meaning of DTSA, the Court need not reach that issue here, because Call One has failed to present evidence from which a reasonable jury could find the misappropriation needed to establish liability under the Act.

Although it is not clear that Anzine has used the information contained in the Customer Report since she left Call One, all reasonable inferences are drawn in Call One's favor at this stage, and in any case, there is no dispute that she disclosed it to McKeon and attorney Karlin. Call One contends that Anzine's unauthorized disclosures of the Customer Report to McKeon and Karlin[8] constitute misappropriation under DTSA because Anzine had a duty to preserve the confidentiality of Call One's documents. *See* 18 U.S.C. §§ 1839(5)(B)(i)-(ii) (misappropriation includes unauthorized disclosure of a trade secret by a person who used improper means to acquire knowledge of the trade secret and unauthorized disclosure of a trade secret by a person who knew or had reason to know that the knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret").

The information contained in the Customer Report, such as the total monthly recurring charges for each client, would not be available to the general public. Additionally, Call One's Employee Handbook and Information Security Policies prohibit

---

[8] It is unclear why Call One lumps Karlin in with McKeon here. The suggestion that providing a document to one's attorney after learning of a lawsuit somehow constitutes trade secret misappropriation is patently ridiculous.

employees from accessing, disclosing, or e-mailing unencrypted confidential information (which "may include" customer lists) unless it is necessary to do their jobs. Call One's Information Security Policies also provide, however, that confidential data and trade secrets must be labeled and that employees "must be advised of any confidential data [to which] they have been granted access." Policy Manual at 20, 115. Call One points to no evidence that the Customer Report was marked confidential, and Kintz's e-mail did not indicate that the Customer Report contained trade secrets or other confidential information. Access One CEO Barkley's opinion as to the confidentiality of the information contained in the Customer Report is irrelevant on the question of Anzine's knowledge, and Kintz's after-the-fact testimony that he understood the monthly recurring charge information included in the Customer Report to be confidential does not assist Call One in attempting to show that Anzine had a duty to maintain the Report's secrecy, seeing as how he failed to communicate that understanding at the time.

Even when the facts are viewed in the light most favorable to Call One, the Court is not persuaded that Anzine could reasonably be considered to have owed any duty to protect the confidentiality of the Customer Report when it was not actually identified as being confidential, given Call One's own requirement that all confidential information and trade secrets be marked as such.[9] As a result, no reasonable jury could find that she acquired knowledge of the Customer Report through improper means by breaching

---

[9] The Court is likewise unpersuaded by Call One's conclusory assertion that Anzine had a duty to protect the secrecy of the Customer Report because some entries contained confidential Customer Proprietary Network Information (CPNI) in the form of an account telephone number; the statutory definition of CPNI makes no mention of account telephone numbers. *See* 47 U.S.C. § 222(h)(1).

a duty to maintain secrecy. *See* 18 U.S.C. §§ 1839(5)(B)(i), (6)(A). In addition, it follows from the conclusion that Anzine owed no duty to maintain the secrecy of the Customer Report that no reasonable jury could find that she knew or had reason to know that the Customer Report was acquired under circumstances giving rise to a duty to maintain secrecy. *See id.* § 1839(5)(B)(ii)(II). The fact that Anzine deleted some files, including a copy of the Customer Report, from the desktop of her Call One-issued laptop on December 15, 2017 and December 20, 2017—while she was in negotiations with Call One regarding a possible independent distributorship arrangement and still working for Call One in the meantime—does not, without more, permit a reasonable inference that she somehow understood that the Customer Report was a confidential document and that she had a duty to maintain its secrecy.

Lastly, although Anzine initially acquired the Customer Report in September 2016 through legitimate means when Kintz e-mailed it to her, along with the other sales representatives, for review, Call One also argues that Anzine can be considered to have "acquired" the Customer Report by "improper means" when she later e-mailed it to herself at two different private e-mail accounts. The Court is not persuaded, under these circumstances, that a reasonable jury could find that Anzine acquired the Customer Report by improper means simply by sending it to her personal e-mail account. The sole case that Call One cites in support of this argument is *Yager v. Vignieri*, No. 16CV9367(DLC), 2017 WL 4574487 (S.D.N.Y. Oct. 12, 2017), which suggested in *dicta* that sending work documents containing trade secrets to personal e-mail accounts could be considered an acquisition of trade secrets by improper means. *Id.* at *3. Another case, *AUA Private Equity Partners, LLC v. Soto*, No. 1:17-CV-8035-

GHW, 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018), concluded that uploading trade secrets to a personal Google Drive account would qualify as an acquisition through improper means because it violated the company's confidentiality policies and the defendant's "duty to maintain the secrecy of [her employer's] trade secrets." *Id.* at *5. Because that case was decided at the motion to dismiss stage, however, there was no dispute regarding whether the information at issue was in fact a trade secret or otherwise confidential. *Id.* By contrast, in the present case, the Court has concluded that Call One has not presented evidence from which a reasonable jury could find that Anzine violated a duty to maintain the secrecy of the Customer Report.

Because Call One has not presented specific facts from which a reasonable jury could conclude that Anzine misappropriated the Customer Report under the circumstances, the Court grants Anzine's motion for summary judgment on Call One's DTSA claim. (Anzine did not move for summary judgment on the Illinois Trade Secrets Act claim, despite noting the overlap between DTSA and pre-existing state trade secrets laws like ITSA.) The Court denies Anzine's request for attorney's fees and costs, however, because it does not find that Call One made the DTSA claim in bad faith.

## Conclusion

For the foregoing reasons, the Court grants Anzine's motion for summary judgment on her counterclaim [dkt. no. 24], finding the non-solicitation covenant unenforceable as written but reforming the covenant as stated in the body of this opinion. Counsel are to prepare a proposed declaratory judgment embodying the Court's decision regarding the counterclaim and are to be prepared to present it at the upcoming status hearing. The Court also grants Anzine's motion for summary judgment

on count 1 of the amended complaint [dkt. no. 46].  Call One's motion for leave to file

additional statements of fact is terminated as moot, as the Court has considered the

matters set forth in the motion and attachments [dkt. no. 86].  The Court sets the case

for a status hearing on June 11, 2018 at 8:30 a.m.  The parties should be prepared to

discuss at the status hearing what remains of the case and what is necessary to bring

the case to a conclusion.

                                                    _____
                                                    MATTHEW F. KENNELLY
                                                    United States District Judge

Date:  June 7, 2018